UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
FILED

AUG 3 0 2022

NATHAN OCHSNER
CLERK OF COURT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| vs | § | CRIMINAL NO. B-22-740 |
| | § | |
| RUBEN GALLEGOS, JR. | § | |

PARTIALLY
UN**SEALED** 9/1/22
**INDICTMENT**

THE GRAND JURY CHARGES:

**Introduction**

At all times material to this Indictment:

1. The United States Department of Health and Human Services ("HHS") was a department of the federal government. The Administration for Children and Families ("ACF") was an operating division of HHS. The Office of Refugee Resettlement ("ORR") and the Office of Grant Management ("OGM") were offices of ACF.

2. The Unaccompanied Alien Children Program ("UAC Program") was administered by the ORR. The UAC Program provided temporary shelter care and other related services to unaccompanied alien children who arrived in the United States. The OGM awarded grants to contractors that provided temporary shelter care and related services in the UAC Program. The United States Congress prohibited use of grant funds to pay salaries above a certain rate. Federal regulations further limited spending of grant funds.

3. International Educational Services, Inc. (IES) was a non-profit corporation organized under the laws of the state of Texas that operated primarily in the Rio Grande Valley. IES contracted with the federal government under the UAC Program to provide temporary shelter care and other related services to unaccompanied alien children. IES received nearly all its funding in the form of federal grants. For each fiscal year (FY) from 2014 through 2018, IES received millions of dollars in federal grant funds.

5. Defendant RUBEN GALLEGOS, JR. was the Chief Executive Officer of IES.

## COUNT ONE
### (18 U.S.C. § 371 – Conspiracy)

7. Beginning in or around 2014 and continuing through 2018, Defendants,

**RUBEN GALLEGOS, JR.**

did knowingly combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury, to commit an offense against the United States, namely: to embezzle, steal, obtain by fraud, knowingly convert without authority, and intentionally misapply property that is valued at $5,000 U.S. Dollars or more, and is owned by, or is under the care, custody, or control of, an organization that receives more than

2

$10,000.00 U.S. Dollars in federal assistance in any one year period, in violation of 18 U.S.C. § 666(a)(1)(A).

## Manner and Means of the Conspiracy

It was part of the conspiracy that:

8. Through various means,                    , RUBEN GALLEGOS, JR. and                , and others sought to embezzle, steal, obtain by fraud, knowingly convert without authority, and intentionally misapply federal grant funds that had been awarded to IES.

9. In 2014 through 2017, Defendants caused IES to use federal grant funds to pay themselves salaries that were hundreds of thousands of dollars above the salary cap imposed by federal regulations.

10. Defendants approved less than arms-length transactions in which IES used federal grant funds to lease properties from Defendants, or related entities, at rates in excess of the limits imposed by federal regulations.

11.                and RUBEN GALLEGOS, JR. approved less-than-arms-length transactions in which IES used federal grant funds to lease vacant lots and residential properties from            and RUBEN GALLEGOS, JR., or related entities.

12.             and            approved less-than-arms-length transactions in which IES used federal grant funds to pay for multiple leases on the same properties that were owned by            , or related entities, in order to inflate rental income paid with federal grant funds to

13. Defendants approved less-than-arms-length transactions in which IES used federal grant funds to pay for construction on property owned by RUBEN GALLEGOS, JR., through a related entity, even though reimbursement of construction costs with grant funds was prohibited by federal regulations.

14. Defendants approved transactions in which IES contracted for unallowable consulting fees from related individuals or entities which were paid with federal grant funds.

15. Defendants, and others, took steps to hide the scheme, including but not limited to:

    (a) using real estate holding companies to conceal their ownership of properties that they were leasing to IES;
    (b) failing to report related-party leases in audits;
    (c) paying inflated salaries and related-party leases as unspecified indirect costs;
    (d) listing prohibited construction costs as operational costs; and
    (e) failing to disclose contracts for services with related parties.

## Overt Acts

In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, in the Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

16. In or about 2014,                           and RUBEN GALLEGOS, JR. met in                           office and discussed increasing their compensation at IES.

17. In this meeting, RUBEN GALLEGOS, JR. told                           that RUBEN GALLEGOS, JR. wanted his annual salary increased to approximately $350,000.00 U.S. Dollars.

18. In this meeting, _____ told _____ to pay _____ an additional $1,000.00 U.S. Dollars a month more than the $350,000.00 U.S. Dollar annual salary of RUBEN GALLEGOS, JR.

19. In this meeting, _____ told _____ to increase _____ salary to $250,000.00 U.S. Dollars plus a bonus.

20. With the Defendants' approval, in 2014, IES paid _____ a salary of approximately $505,541.68 U.S. Dollars in violation of the cap limit of $181,500.00 U.S. Dollars.

21. With the Defendants' approval, in 2014, IES paid RUBEN GALLEGOS, JR. a salary of approximately $491,540.04 U.S. Dollars in violation of the cap limit of $181,500.00 U.S. Dollars.

22. With the Defendants' approval, in 2014, IES paid _____ a salary of approximately $375,177.32 U.S. Dollars in violation of the cap limit of $181,500.00 U.S. Dollars.

23. With the Defendants' approval, in 2015, IES paid _____ a salary of approximately $506,003.22 U.S. Dollars in violation of the cap limit of $183,300.00 U.S. Dollars.

24. With the Defendants' approval, in 2015, IES paid RUBEN GALLEGOS, JR. a salary of approximately $492,001.62 U.S. Dollars in violation of the cap limit of $183,300.00 U.S. Dollars.

25. With the Defendants' approval, in 2015, IES paid _____ a salary of approximately $377,060.96 U.S. Dollars in violation of the cap limit of $183,300.00 U.S. Dollars.

26. With the Defendants' approval, in 2016, IES paid a salary of approximately $506,003.22 U.S. Dollars in violation of the cap limit of $185,100.00 U.S. Dollars.

27. With the Defendants' approval, in 2016, IES paid RUBEN GALLEGOS, JR. a salary of approximately $492,001.62 U.S. Dollars in violation of the cap limit of $185,100.00 U.S. Dollars.

28. With the Defendants' approval, in 2016, IES paid a salary of approximately $376,061.46 U.S. Dollars in violation of the cap limit of $185,100.00 U.S. Dollars.

29. With the Defendants' approval, in 2017, IES paid a salary of approximately $450,095.00 U.S. Dollars in violation of the cap limit of $187,000.00 U.S. Dollars.

30. With the Defendants' approval, in 2017, IES paid RUBEN GALLEGOS, JR. a salary of approximately $435,416.88 U.S. Dollars in violation of the cap limit of $187,000.00 U.S. Dollars.

31. With the Defendants' approval, in 2017, IES paid a salary of approximately $249,715.78 U.S. Dollars in violation of the cap limit of $187,000.00 U.S. Dollars.

32. Beginning in or about 2014, Defendants engaged in a series of less-than-arms-length transactions, or related party transactions, where Defendants leased properties in which they had a financial interest to IES.

33. Defendants received federal compensation for these leases in excess of the limits imposed by federal regulations.

34. Defendants caused IES to lease properties, such as vacant lots and residential properties that were not used to provide any meaningful services to alien children.

35. Following the direction of            and RUBEN GALLEGOS, JR., Defendants and IES did not comply with federal regulations requiring competitive bidding.

36. Following the direction of            and RUBEN GALLEGOS, JR., Defendants and IES did not comply with federal regulations setting rental costs limits in less-than-arms-length transactions.

37. Following the direction of           , and            approved less-than-arms-length transactions in which IES executed multiple leases on the same properties that were owned by           , or related entities, to inflate rental income paid with federal grant funds to

38. In June 2014, RUBEN GALLEGOS, JR., through a related entity, purchased a property in San Benito, Texas (San Benito Property) for approximately $1,000,000.00 U.S. Dollars. This location would become the site of the IES San Benito Shelter.

39. In 2014, Defendants caused a grant application to be submitted to ORR requesting funds to operate the IES San Benito Shelter. Defendants falsely claimed that the shelter was operational and would serve approximately 1,040 children during FY-2015. The IES San Benito Shelter was not operational during FY-2015.

40. On or about July 1, 2014,            signed a five-year lease on behalf of IES in which IES agreed to rent the San Benito Property from RUBEN

GALLEGOS, JR., through a related entity, at a rate of $35,000.00 U.S. Dollars per month ($420,00.00 U.S. Dollars per year). This lease amount was far in excess of the limits imposed by federal regulations. For approximately the first 14 months of the lease, no children were housed at the IES San Benito Shelter.

41. From 2014-2015, Defendants authorized transactions that caused IES to spend approximately $3.2 million dollars in federal grant money for prohibited construction costs at the IES San Benito Shelter.

42. On March 14, 2016,                issued an IES check in the amount of $40,000 U.S. Dollars payable to Company A, a company associated with RUBEN GALLEGOS, JR.

43. On April 18, 2016, RUBEN GALLEGOS, JR. received a check in the amount of $40,000 U.S. Dollars from Company A.

44. In 2014 and 2015, Defendants caused IES to pay unallowable consulting fees to a person related to             and RUBEN GALLEGOS, JR.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### (Theft Concerning Programs Receiving Federal Funds, 18 U.S.C. §§ 666 and 2)

45. The Grand Jury adopts, realleges, and incorporates herein the Introduction and Manner and Means sections of the Indictment as if set out fully herein.

46. From on or about January 1, 2017, and continuing until on or about December 31, 2017, in the Southern District of Texas, Defendants,

**RUBEN GALLEGOS, JR.**

being agents of IES, an organization that receives, in any one-year period, benefits in excess of $10,000 U.S. Dollars under a federal grant program, did, embezzle, steal, obtain by fraud and otherwise without authority knowingly convert to the use of any person other than the rightful owner, and intentionally misapply, property that is valued at $5,000 U.S. Dollars or more and is owned by, and is under the care, custody, and control of such organization, that is, federal grant funds paid to Defendants as salary.

In violation of Title 18, United States Code, Section 666(a)(1)(A) and 2.

## NOTICE OF FORFEITURE
### (18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c))

47. Pursuant to Title 18, United States Code, Section 981(a)(1)(C), through application of Title 28, United States Code, Section 2461(c), the United States gives notice to defendants,

**RUBEN GALLEGOS, JR.**

that upon conviction of any of the Counts of this Indictment, all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses is subject to forfeiture.

## Property Subject to Forfeiture

48. The specific property to be forfeited includes, but is not limited to, the following:

A) One Hundred Thousand, Two Hundred Dollars ($100,200.00), more or less, in United States Currency.

B) Real property located and situated on Maverick Road, including any and all buildings, appurtenances, and improvements thereon and any and all surface rights, title and interests, if any. The property is fully described as:

*A certain tract, parcel or piece of land out of the Western portion of Block Number 29, Esperanza Subdivision, in Share Number 23, Espiritu Santo Grant, Cameron County, Texas, as said Esperanza Subdivision as shown in map recorded in Volume 7, Page 33, Map Records of Cameron County, Texas, and portion of Share Number 28, Espiritu Santo Gant, Cameron County, Texas, particularly described as follows to-wit:*

*BEGINNING at a point in the South LINE OF Block 29, in the centerline of the road, which pint is South 80 deg. 28 min. East 375 feet from the Southwest corner of said Block 29 (this point being the Southeast corner of a 2.41 acre tract heretofore conveyed to William N. Rock by deed dated 2-8-60, recorded in Volume 689, Page 289, Deed Records of Cameron County, Texas.)*

*THENCE, North 9 deg. 32 min. Last parallel to the West line of said Block 29, 488.7 ft. to point for the Northeast corner of this tract;*

*THENCE, South 80 deg. 28 min. East 631.1 ft to point in the West line off Share 28;*

*THENCE, North 9 deg. 18 min. East 1213.8 ft. to point for the most Northerly corner of this tract;*

*THENCE, South 2 deg. 34 min. West 1715.15 ft. to point for the Southeast corner of this tract, said point being in the centerline of a public road;*

*THENCE, North 80 deg. 28 min, West 834.8 ft. to the place of beginning, containing in all 9.57 acres, more or less, being 5.64 acres, more or less out of Block 29, and 3.93 acres, more or less, out of Share 28.*

C) Real property located and situated on 5447 Maverick Road, Brownsville, TX, including any and all buildings, appurtenances, and improvements thereon and any and all surface rights, title and interests, if any. The property is fully described as:

*BEING 0.525 acre of land out of a 3.93 acre tract in Share 28, ESPIRITU SANTO GRANT, Cameron County, Texas, said 3.93 acre tract being recorded in Volume 725, Pages 137-138, Deed Records of Cameron County, Texas; and 0.525 acre of land being more particularly described as follows:*

*BEGINNING at the Engineers Tact for the Southwest corner of Block 29, ESPERANZA PLACE ADDITION, said point being on the centerline of Southmost Road and the centerline of Maverick Road;*

*THENCE along the South boundary line of Block 29, centerline of Maverick Road, South 80 degrees 28 minutes East, 908.7 feet pass a point for the Southeast corner of Block 29, Southwest corner of said 3.93 acre tract, and at a total distance of 945.7 feet to the POINT OF BEGINNING, said point being the Southwest corner of this tract;*

*THENCE leaving the South boundary line of the 3.93 acre tract, and the centerline of Maverick Road, North 08 degrees 28 minutes East, 146.02 feet to a point for the Northwest corner of this tract;*

*THENCE along the East boundary line of the 3.93 acre tract, South 02 degrees 34 minutes West, 147.08 feet to a point for the Southeast corner of said 3.93 acre tract and the Southeast corner of this tract;*

*THENCE along the South boundary line of the 3.93 acre tract, and the centerline of Maverick Road, North 80 degrees 28 minutes West, 164.1 feet to the POINT OF BEGINNING, containing 0.525 acre of land, more or less.*

**Money Judgment and Substitute Assets**

49. The United States gives notice that it will seek a money judgment against the Defendants. In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exist, the United States will seek to forfeit any other property of the Defendants up to the amount of the money judgment.

A TRUE BILL:

_____
FOREPERSON OF THE GRAND JURY

JENNIFER B. LOWERY
UNITED STATES ATTORNEY

_____
ISRAEL CANO III
Assistant United States Attorney

_____
PAUL MARIAN
Assistant United States Attorney